[No. H037450. Sixth Dist. Feb. 6, 2013.]

SHIVANI BIGLER, Plaintiff and Respondent, v.
THE HARKER SCHOOL et al., Defendants and Appellants.

COUNSEL

Michael J. Vartain, Kathryn J. Burke and Stacey L. Leask for Defendants and Appellants.

Hartnett, Smith & Paetkau, James Hartnett, Jay Withee; Kerr & Wagstaffe, James Wagstaffe and Daniel Zaheer for Plaintiff and Respondent.

OPINION

ELIA, J.—The Harker School (Harker) and one of its teachers, Peter Itokazu, appeal from an order denying their petition to compel arbitration of contract and tort claims brought by plaintiff Shivani Bigler, a student at the school.[1] Defendants contest the superior court's conclusion that a broad arbitration provision in the enrollment contract signed by Shivani's parents is unconscionable and therefore unenforceable. They further challenge the court's finding that the contracting parties would not have reasonably expected the tort allegations of the complaint to be included in the arbitration process. Having independently considered these issues in light of the record, we agree with Harker that the arbitration provision is valid and applicable to the tort allegations.

*Background*

Shivani was enrolled at Harker from 1999 until April 27, 2011. Each year her parents were presented with an enrollment contract for the following school year. In January 2010, the head of school enclosed a letter along with the proposed contract for the 2010–2011 school year. In the letter sent to the Biglers, he asked them to return the contract with their deposit by February 10, 2010, in order to ensure that space was reserved for Shivani in the 11th grade.

On May 13, 2011, Shivani, represented by the Biglers as her guardians ad litem, filed a complaint against Harker and one of its teachers, Peter Itokazu. Shivani claimed that she was "mistakenly or wrongfully accused of an honor

---

[1] This action originally was brought by Shivani's parents, Robert and Punita Bigler, as her guardians ad litem, but she reached the age of majority during the pendency of the appeal. As her parents are pursuing their own claims against Harker, we will refer to them as the Biglers and to respondent Shivani Bigler by her first name.

code violation," which was "not investigated and resolved pursuant to fundamentally fair policies and procedures and in good faith." The accusation was later repeated by Anthony Silk, another instructor, in an assembly attended by the entire upper school student body, many of whom knew the identity of the student described in the presentation. The Biglers withdrew Shivani from the school on April 27, 2011, to avoid her having to accept an "undeserved" two-day suspension and the accompanying "lifelong mark against her record."

Shivani's complaint further related an incident in March of that year, in which Itokazu sarcastically belittled and humiliated her in front of other students. Shivani had participated in an academic competition sponsored by the Rotary Club. After her team finished second, Shivani went to his classroom after school to "share the news of her accomplishment" with Itokazu. Itokazu, however, "displayed a lack of interest that confused and hurt Shivani. She mentioned to him that she thought he would be happier for her. With several students in the classroom watching, Mr. Itokazu began jumping around a desk at the front of the classroom in a sarcastic 'dance,' sarcastically saying words to the effect that he was so happy with her second-place finish." He then "hopped up to Shivani and wrapped his arms around her while facing her, pinning her arms to her sides. He held Shivani tightly against him so she couldn't move or get free of his grip, then began hopping up and down with her, repeating words of similar sarcastic import as before." After several seconds of this "dancing" in front of the other students, Itokazu "released her with sufficient force to cause Shivani to fall backward onto the classroom floor, backpack and all."

Shivani asserted eight causes of action in her complaint. Against only Harker she alleged breach of contract and breach of the covenant of good faith and fair dealing, as a third party beneficiary of the enrollment agreement signed by her parents; defamation occurring at the student assembly; and negligent hiring, retention, and/or supervision of Itokazu. She further alleged battery, defamation, and negligent infliction of emotional distress against both Harker and Itokazu arising out of Itokazu's conduct, and interference with prospective economic advantage against only Itokazu.

The same day they filed the complaint on Shivani's behalf, the Biglers initiated contractual arbitration in their own names, alleging breach of contract, breach of the covenant of good faith and fair dealing, and negligent hiring, retention, and/or supervision against Harker. Based on the same facts that were alleged in Shivani's complaint, the Biglers generally asserted that Harker violated *their* rights under the enrollment agreement and the

student/parent handbook to a "meaningful investigation" of the accusations against Shivani, to allow her to present her side of the story, and "to have Shivani be represented" at the honor council proceeding by her student adviser or another faculty member. The Biglers alleged that they had attempted to persuade Harker to reevaluate the disciplinary consequences imposed on Shivani "and to honor its obligations to [the Biglers] under the enrollment agreement, Handbook, and other sources of express and implied obligation." In both the first two claims the Biglers finally asserted that they were entitled to a declaration from the arbitrator regarding whether *Shivani* was entitled under the contract and the good faith covenant to receive fair procedures for investigating and remediating allegations of academic dishonesty. As a result of Harker's denial of a fair hearing to Shivani, the Biglers themselves had allegedly suffered "irreparable harm" through Shivani's loss of future educational and employment opportunities and the loss of both their and Shivani's association with the Harker community.[2]

Thus, in the Biglers' first and second arbitration claims, Harker was alleged to have made an "arbitrary and capricious decision to discipline Shivani," in violation of the "rules, policies, procedures, and standards contained in the Handbook and/or any other source of rights and obligations controlling the contractual relationship between Mr. and Mrs. Bigler and Harker." In the third claim they alleged a duty by Harker, acting in loco parentis, to use reasonable care in hiring, supervising, and retaining faculty. Harker failed to use such care; it knew or should have known that Itokazu was an "unfit and/or incompetent" teacher who posed a "substantial and unreasonable risk of harm to Harker students, including Shivani."

Defendants demanded arbitration of Shivani's claims, but the Biglers refused, citing defects in the demand. On June 10, 2011, defendants petitioned the superior court for an order to compel the Biglers to arbitrate Shivani's claims. They relied on the following paragraph in the enrollment contract the Biglers had signed for the 2010–2011 school year: "**Arbitration.** [¶] I understand and agree that any dispute involving the School, except with respect to my obligation to pay tuition or fees, shall be resolved by arbitration. Arbitration shall be conducted in Santa Clara County by a single neutral arbitrator according to the commercial rules of the American Arbitration Association then in effect. The decision of the arbitrator shall be final and binding, with no right of appeal. The arbitrator shall award attorneys' fees and costs, including the expense of arbitration, to the prevailing party."

---

[2] The Biglers did not note in complaining about the loss of association that their two other children currently attended or had attended Harker.

In the petition defendants noted that the Biglers themselves had demanded arbitration of their own claims, which overlapped those of Shivani, yet they had refused to arbitrate Shivani's third party beneficiary claims under the same contract. Thus, defendants argued, equitable estoppel prevented the Biglers from depriving defendants of the same right to arbitration. Defendants added that if they prevailed, they would waive the contract provision entitling them to attorney fees.

The Biglers opposed the petition on the ground that enforcement of the arbitration provision against Shivani would be procedurally and substantively unconscionable. The provision was procedurally unconscionable, they argued, because (1) the enrollment contract was a "take-it-or-leave-it, adhesory" contract imposed on them by a stronger party, (2) application of the provision would be oppressive in view of the "nature of the harm Shivani suffered and the inadequacy of the arbitral forum to make her whole," (3) the contract contained an "illegal fee-shifting provision," (4) Harker failed to provide them with a copy of the American Arbitration Association (AAA) commercial rules, and (5) the provision was presented "in the same typeface and point size as all other provisions."

Substantive unconscionability was also evident, according to the Biglers, because of "an 'overly harsh' and 'one-sided' effect that undermines Shivani's ability to obtain complete relief for the lifelong consequences of the damage Harker School and Mr. Itokazu inflicted on her, without requiring any corresponding sacrifice on their part." The Biglers offered a detailed picture of this damage, which meant the loss of "the use of the *entire history* of her enrollment at Harker School, which she needs to have access to the 'top-tier' colleges and universities and increased opportunities for rewarding and remunerative career choices Harker promised her. . . . Without the opportunity to *complete* her education at Harker, all of her previous years of effort are wasted. She also lost her *identity* as a member of the Harker Community, together with access to her peer group and the many enriching alumni contacts Harker promised her."

Finally, the Biglers contended that the intentional torts Shivani was alleging—namely, battery, emotional distress,[3] and defamation—were not arbitrable because the Biglers could not have intended to waive their daughter's right to a jury trial for such conduct when they signed the enrollment

---

[3] This claim was *negligent* infliction of emotional distress, not *intentional* infliction of emotional distress.

contract. And because the negligent hiring/retention/supervision claim was founded on Itokazu's intentional torts, this cause of action against Harker was necessarily nonarbitrable as well.

In support of the Biglers' unconscionability position, Robert Bigler submitted a declaration stating, "Each year, including the 2010–2011 academic year, the enrollment contract was presented to my wife and I [*sic*] by Harker School on a 'take-it-or-leave-it' basis. . . . [¶] At no time . . . did Harker School ever provide my wife and I [*sic*] with a copy of the [AAA] Rules referenced in the enrollment contract." Harker's business manager, however, stated in his declaration that Harker had not presented the contract on a " 'take-it-or-leave-it' " basis, nor had it ever communicated any unwillingness to negotiate or discuss modification of the terms. Furthermore, the Biglers had never asked whether the arbitration provision was negotiable, had never expressed a wish to modify any of the terms, and had never proposed any modification.

At the hearing on July 7, 2011, the trial court rejected the Biglers' depiction of the enrollment contract as having been presented on a "take-it-or-leave-it" basis, since nothing indicated a refusal or unwillingness by Harker to discuss or negotiate the terms, and the issue apparently had never been discussed between the parties. Instead, the court's focus was on the comprehensiveness of the arbitration provision, as it covered "any dispute." The court was further concerned with the provision for attorney fees and with the "carve-out" for tuition. Defense counsel, however, acknowledged that the attorney fee provision was inconsistent with current law and AAA procedures, and he urged the court to sever that clause entirely. As to the "carve-out" for tuition disputes, defendants pointed out that the arbitration exception was mutual, not one-sided; moreover, the most likely scenario would have been a tuition-related claim by the parents *against* the school (e.g., for a refund), since every academic year began with the school's having already received full payment.

On August 15, 2011, the superior court filed its order denying defendants' petition. The court agreed with the Biglers that the enrollment contract was unconscionable; that the objection to arbitration of Shivani's claims was not waived by her parents' own demand for arbitration; that because the whole agreement was unconscionable, severance was not appropriate; and that it was "highly unlikely" that the Biglers had agreed to the arbitration provision with the expectation that tort claims would be included in the process. This appeal followed.

*Discussion*

1. *Unconscionability*

The primary issue raised by defendants' appeal is whether Shivani's claims are subject to arbitration in accordance with the enrollment contract her parents signed. She implicitly acknowledges that she was bound by that contract to the extent that its provisions are valid.

█ Our Legislature has deemed arbitration agreements valid except when there are grounds to revoke the contract. (Code Civ. Proc., § 1281.) When a petition to compel arbitration is filed based on a written agreement, the court must order arbitration if it finds such agreement to exist, unless the petitioner has waived the right or there are grounds to revoke the agreement. (Code Civ. Proc., § 1281.2.) One of those grounds is unconscionability of the contract: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." (Civ. Code, § 1670.5, subd. (a).)

█ Consistent with the Legislature's statutory scheme, "California courts have uniformly acknowledged that there is a strong public policy in favor of arbitration. [Citations.] Thus, 'doubts concerning the scope of arbitrable issues are to be resolved in favor of arbitration. [Citations.]' [Citation.]" (*Suh v. Superior Court* (2010) 181 Cal.App.4th 1504, 1511–1512 [105 Cal.Rptr.3d 585]; see *Wagner Construction Co. v. Pacific Mechanical Corp.* (2007) 41 Cal.4th 19, 25–26 [58 Cal.Rptr.3d 434, 157 P.3d 1029] [arbitration statutes "reflect a ' "strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution" ' "].) "Consequently, courts will ' "indulge every intendment to give effect to such proceedings." ' " (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899].)

Shivani relies on the statutory exception for unconscionability in challenging the validity of the arbitration clause in the enrollment contract. If this clause is indeed unconscionable, then all of her allegations may be pursued in a judicial forum. If, however, the provision is enforceable, then we must decide whether the tort claims are outside its scope. As the party opposing arbitration, it was Shivani who had the burden of proving the defense of unconscionability. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 [145 Cal.Rptr.3d 514, 282 P.3d 1217].)

Harker contends, as it did below, that the Biglers are equitably estopped from asserting the invalidity of the arbitration clause—or, alternatively, they forfeited or waived this argument—because they initiated and pursued arbitration for their own claims based on the same events. We agree with the superior court, however, that even though the Biglers prosecuted Shivani's lawsuit below as her guardians ad litem, her independent action was not necessarily precluded by her parents' own litigation conduct. That conclusion is strengthened by the fact that Shivani, having reached adulthood, is now proceeding in her own name. We therefore move on to the central issue, whether the agreement is invalidated by unconscionability.

Civil Code section 1670.5 indicates that unconscionability is ultimately a question of law for the court. (*Flores v. Transamerica HomeFirst, Inc.* (2001) 93 Cal.App.4th 846, 851 [113 Cal.Rptr.2d 376]; *Gatton v. T-Mobile USA, Inc.* (2007) 152 Cal.App.4th 571, 579 [61 Cal.Rptr.3d 344].) To the extent that questions of fact were presented to the trial court, we accept that court's findings if they are supported by substantial evidence. If the evidence was undisputed, however, we independently determine whether the agreement is unconscionable. (*Parada v. Superior Court* (2009) 176 Cal.App.4th 1554, 1567 [98 Cal.Rptr.3d 743]; *Flores v. Transamerica HomeFirst, Inc., supra,* 93 Cal.App.4th at p. 851, quoting *Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc.* (2001) 89 Cal.App.4th 1042, 1055 [107 Cal.Rptr.2d 645].)

█ As our Supreme Court has explained, unconscionability has both a procedural and a substantive element. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 [99 Cal.Rptr.2d 745, 6 P.3d 669] (*Armendariz*).) "Procedural unconscionability focuses on oppression, surprise and the manner in which the agreement was negotiated. [Citation.] Substantive unconscionability focuses on 'the actual terms of the agreement and evaluates whether they create such " 'overly harsh' " or " 'one-sided' " results as to " 'shock the conscience.' " ' [Citations.]" (*Suh v. Superior Court, supra,* 181 Cal.App.4th at p. 1515.) " ' "The prevailing view is that [procedural and substantive unconscionability] must both be present" ' " before a court can refuse to enforce an arbitration provision based on unconscionability. " 'But they need not be present in the same degree. . . . [T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' " (*Gentry v. Superior Court* (2007) 42 Cal.4th 443, 469 [64 Cal.Rptr.3d 773, 165 P.3d 556] (*Gentry*), quoting *Armendariz, supra,* 24 Cal.4th at p. 114.) "Thus, a conclusion that a contract contains no element of procedural unconscionability is tantamount to saying that, no matter how one-sided the contract terms, a court will not disturb the contract because of its confidence that the contract was negotiated or chosen freely, that the party subject to a seemingly one-sided term is presumed to have

obtained some advantage from conceding the term or that, if one party negotiated poorly, it is not the court's place to rectify these kinds of errors or asymmetries." (*Gentry, supra,* 42 Cal.4th at p. 470; see *Suh v. Superior Court, supra,* 181 Cal.App.4th at p. 1515.)

In this case the superior court first determined that the contract was adhesive, an indication of procedural unconscionability. As noted earlier, the court did not base its determination on Robert Bigler's declaration that the contract was presented on a "take-it-or-leave-it" basis. The court recognized that the evidence was conflicting on that point, and it concluded that the subject most likely "never came up." Instead, the court found that the parties to the enrollment contract had unequal bargaining positions.[4] The court further found the exclusion for tuition disputes to be "troubling," and the provision for attorney fees, though waived by Harker, had "an intimidating effect." Less significant in the court's view, but still factors, were Harker's failure to provide a copy of the AAA rules and the lack of any highlighting of the arbitration clause in the document.

We agree that the absence of the AAA rules is of minor significance to our analysis. We are, however, less convinced than the superior court that the other circumstances indicate procedural unconscionability. The arbitration clause was located at the top of the second page in a two-page document with the heading "Arbitration" in boldfaced font. The Biglers did not offer any evidence that the provision was new in 2010, nor that they had never seen it over the many years they had signed the same document for their three children. They did not complain to the Harker administration that the arbitration provision was unfair or attempt to negotiate its deletion from the terms. As in *D.C. v. Harvard-Westlake School* (2009) 176 Cal.App.4th 836, 868 [98 Cal.Rptr.3d 300], "[w]e cannot say, in the context of an enrollment contract with a private school, that, as a matter of law, a student's parents are unable to [persuade] the school to remove a provision they dislike." Thus, we find neither of the procedural unconscionability elements of oppression and surprise in the inclusion of an arbitration provision.

We likewise perceive insufficient indications of substantive unconscionability. Shivani represents the arbitration provision as one-sided because it states, "I understand and agree that any dispute involving the School, except with respect to my obligation to pay tuition or fees, shall be resolved by arbitration." In her view, only the parents agree to arbitration; Harker "did not

---

[4] The court observed, "Parents of a student who has completed most of his/her academic career at a prestigious school and who have extremely ambitious educational goals that must include completion of that school's curriculum are essentially locked into remaining at that school. They would naturally be constrained to disturb the enrollment process by raising questions about the arbitration clause."

agree by the above provision to arbitrate *any* of its own claims." We do not read such nonmutuality into the agreement. The parents, by signing, are agreeing that any disputes *either party* brings—i.e., "any dispute involving the School"—will be arbitrated. Shivani's emphasis on the words *"my obligation"* to pay tuition is of no significance, since it is only the parents who ever have that obligation in the first place.

We also are not as troubled by the tuition exclusion as was the superior court. As Harker pointed out at the hearing, the "carve-out" for tuition disputes allowed *either* party to resolve those disputes in court—and in Harker's view, it was more likely that it would be parents bringing such actions because Harker always had their full tuition payment long before the school year began. As for the provision for attorney fees to the prevailing party, that term could easily have been severed from the contract pursuant to Civil Code section 1670.5, as Harker's counsel requested. (See *Armendariz, supra*, 24 Cal.4th at pp. 123–124 [explaining benefits of severance rather than voiding entire agreement].) Thus, we do not find such overly harsh or one-sided results as to "shock the conscience" in this case.

## 2. *Arbitrability of the Tort Claims*

Having concluded that the arbitration clause is valid, we next address Shivani's assertion that her tort claims are outside the scope of the provision. Civil Code section 1648 states, "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."

█ It is Shivani's burden as the party opposing arbitration to " ' "demonstrate that an arbitration clause *cannot* be interpreted to require arbitration of the dispute." ' [Citation.] In other words, 'an order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' (*Dryer v. Los Angeles Rams* (1985) 40 Cal.3d 406, 414 [220 Cal.Rptr. 807, 709 P.2d 826].)" (*Titolo v. Cano* (2007) 157 Cal.App.4th 310, 316–317 [68 Cal.Rptr.3d 616].)

In light of California's strong public policy in favor of arbitration, "broad contractual provisions for arbitration are to be liberally construed." (*United Transportation Union v. Southern Cal. Rapid Transit Dist.* (1992) 7 Cal.App.4th 804, 809 [9 Cal.Rptr.2d 702].) "Doubts as to whether an arbitration clause applies to a particular dispute are to be resolved in favor of sending the parties to arbitration. The court should order them to arbitrate unless it is clear that the arbitration clause cannot be interpreted to cover the dispute." (*Id.* at p. 808; see *Weeks v. Crow* (1980) 113 Cal.App.3d 350, 352 [169 Cal.Rptr. 830].)

■ Guided by these principles, we conclude that all of Shivani's claims are subject to arbitration under the broad language of the agreement covering "any dispute involving the School." "A long line of California and federal cases holds that claims framed in tort are subject to contractual arbitration provisions when they arise out of the contractual relationship between the parties." (*Dryer v. Los Angeles Rams, supra,* 40 Cal.3d 406, 418, fn. 12; see *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 712 [111 Cal.Rptr.3d 876].) It is the dispute, not the named cause of action, that is the focus of inquiry. Thus, that the complaint alleges defamation and battery is in itself immaterial; what must be determined is whether the tort claims "have their roots in the relationship between the parties which was created by the contract." (*Berman v. Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, 1003 [119 Cal.Rptr. 130]; see *Izzi v. Mesquite Country Club* (1986) 186 Cal.App.3d 1309, 1315–1316 [231 Cal.Rptr. 315].)

■ The parties debate the applicability of *Victoria v. Superior Court* (1985) 40 Cal.3d 734 [222 Cal.Rptr. 1, 710 P.2d 833] and *RN Solution, Inc. v. Catholic Healthcare West* (2008) 165 Cal.App.4th 1511 [81 Cal.Rptr.3d 892] to the circumstances presented here. In *Victoria* a hospital patient alleged she was sexually assaulted by a hospital orderly. She had signed an agreement to arbitrate which applied to " '[a]ny claim arising from alleged violation of a legal duty incident to this Agreement' " if the claim was asserted " '[o]n account of death, mental disturbance or bodily injury arising from rendition or failure to render services under this Agreement, irrespective of the legal theory upon which the claim is asserted . . . .' " (*Victoria,* at p. 738, italics omitted.) The Supreme Court held that the plaintiff was not required to arbitrate her tort claims because the orderly's alleged misconduct "was entirely outside the scope of his employment. It had nothing to do with providing, or failing to provide, services. . . . [¶] Surely it was not contemplated, let alone expected, by either party to the Agreement that this sort of attack would befall petitioner while she was hospitalized under Kaiser's care. It is, therefore, difficult to conclude that the parties intended and *agreed* that causes of action arising from such an attack would be within the scope of the arbitration clause." (*Id.* at p. 745.) As the court explained, "[a]lthough '[t]he law favors contracts for arbitration of disputes between parties' [citation], ' "there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . ." ' [Citations.] In determining the scope of an arbitration clause, '[t]he court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made [citation].' " (*Id.* at p. 744.)

In *RN Solution, Inc. v. Catholic Healthcare West, supra,* 165 Cal.App.4th 1511, Tanya Woo, the chief executive officer (CEO) of the plaintiff recruiting

company, became involved in an intimate relationship with Stephen Robertson, the vice-president of Catholic Healthcare West (CHW), a company that operated a chain of medical facilities. After Robertson was arrested for felony domestic violence against Woo, CHW terminated the recruiting contract with RN Solution (RNS). RNS sued CHW and Robertson on 16 contract and tort causes of action. The First District, Division One, held that the arbitration clause at issue—requiring " 'any dispute arising out of or in connection with this Agreement' "—was part of an agreement between two business entities governing their business relationship. (*Id.* at p. 1515.) Even a broad construction of the provision could not extend its reach to "tort claims arising from an alleged violent physical assault by an employee of one company against an employee of the other in the context of an intimate domestic relationship between them. Such a possibility could not have been within the parties' contemplation when the language was agreed to, and nothing in the language remotely suggests that it was intended to apply to personal injury tort claims arising outside of the business relationship between CHW and RNS." (*Id.* at p. 1523.)

■ In each of these cases, the lawsuit focused on conduct that was so removed from the professional relationship between the parties that it could not have been contemplated when they executed their agreement to arbitrate disputes. In this case, however, all of the alleged tortious conduct[5] took place on the school campus, either in Itokazu's classroom or at the assembly shortly thereafter, with other students present on both occasions. Each of the claims arising from the cheating accusation—namely, the defamatory accusation by Itokazu, the subsequent defamatory accusation by Silk at the assembly, and Itokazu's interference with Shivani's prospective economic advantage (the fifth, sixth, and seventh causes of action)—referenced Shivani's status as the third party beneficiary of the enrollment agreement between the school and her parents. The fifth cause of action for interference with prospective economic advantage specifically included the allegation that Itokazu's reckless or negligent conduct disrupted Shivani's "contractual relationship with Harker." The allegations of defamation included the assertion that Itokazu and then Silk were acting in the course and scope of their employment and agency with Harker when they falsely accused Shivani of cheating. All of the conduct regarding the cheating accusation does, in our view, relate sufficiently to the relationship between Harker and its students that it would be encompassed in the broad provision for arbitration to which the Biglers agreed.

---

[5] As described earlier, the tort causes of action in the complaint alleged battery, negligent infliction of emotional distress, and defamation, all against both defendants; interference with prospective economic advantage against Itokazu; a separate defamation count against Harker; and negligent hiring, retention and/or supervision against Harker.

The arbitrability of the battery claim is the most vigorously disputed by the parties. We reject defendants' suggestion, distinguishing *Victoria* and *RN Solution*, that the resolution of this question necessarily depends on how extreme the conduct was or the extent of the harm. Yet we do not agree with Shivani's suggestion that because the cause of action is battery, that ends the analysis. Shivani maintains that the Biglers could not have contemplated "that a Harker teacher would commit battery on Shivani. Such conduct does not bear a reasonable relationship to the enrollment contract, no matter how broadly worded the arbitration provision, because teacher-student battery is no more within the scope of the services for which the Biglers contracted than was the orderly's sexual assault on the plaintiff in *Victoria*, even though alleged to have happened in a Harker classroom during school hours."

Shivani's argument, in addition to being circular, would extend to any physical contact by a teacher without a student's consent. Our inquiry, however, requires examination of the conduct and the circumstances alleged, not merely the label of the cause of action. Itokazu's act of wrapping his arms around Shivani and hopping up and down to mock her clearly was offensive and humiliating, but it occurred within the course and scope of his role as her teacher, in his classroom on a school day, concerning an academic performance she had brought to his attention. If, as the Biglers themselves asserted in their arbitration claim, Itokazu's behavior reflected his "unfitness and incompetence" as a teacher, the allegations of battery are arbitrable as coming within the relationship of the school to its student.

Shivani's eighth cause of action for negligent hiring, retention, and/or supervision must follow the other tort claims to arbitration. Her justification for withholding this claim from the disputed provision is attached to her argument regarding battery; that is, because Itokazu's conduct was "unwelcome, deeply offensive and caused [*sic*] severe emotional harm," it did not bear a reasonable relationship to the enrollment contract. This argument disregards the gravamen of the claim, which was primarily based on Itokazu's unfair accusation of cheating and his "belittling" of her academic performance.

We thus conclude that California's " 'strong public policy in favor of arbitration' " and the circumstances alleged in Shivani's complaint call for arbitration in this case. (*Moncharsh v. Heily & Blase, supra*, 3 Cal.4th at p. 9.) Harker may well be found liable under the parties' contract, on a tort theory, or both, but it is the arbitrator who must resolve the questions presented in Shivani's complaint.

## *Disposition*

The order is reversed.

Rushing, P. J., and Premo, J., concurred.